HEISER v. CINCINNATI ABATTOIR CO.

(Supreme Court, Appellate Division, First Department.    December 16, 1910.)

1. MASTER AND SERVANT (§§ 101, 102*)—LIABILITY OF MASTER—SAFE APPLIANCES.

A master does not owe to his servants the duty to furnish the best known appliances, but only such as are reasonably safe and suitable, and such as a prudent man would furnish if his own life were in danger resulting from unsuitable appliances.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 135, 171, 172, 178–184, 192; Dec. Dig. §§ 101, 102.*]

2. MASTER AND SERVANT (§ 270*)—INJURY TO SERVANT—DEFECTIVE APPLIANCES—EVIDENCE.

Where in an action for injuries to a servant while unloading a beef car by means of skids and other appliances, caused by a skid falling, the evidence showed that the kind of skid used by the master was in general use, and had been used for many years without any accident, evidence that another in the same line of business used a different kind of skid fastened by hooks and that the latter kind was safe was inadmissible.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 920, 921; Dec. Dig. § 270.*]

3. MASTER AND SERVANT (§ 270*)—INJURY TO SERVANT—DEFECTIVE APPLIANCES—EVIDENCE.

In an action for injuries to a servant caused by defective appliances furnished him, it is competent to show the kind of appliances in general use by like concerns for similar purposes, but it is not competent to show a particular kind used by one concern.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 921; Dec. Dig. § 270.*]

4. MASTER AND SERVANT (§ 179*)—INJURY TO SERVANT—NEGLIGENCE—"WAY."

A servant was injured while at work unloading a beef car. The master furnished the servants with skids extending from the car to a platform, and a truck running on wheels, and other appliances. The truck, while pushed by fellow servants, pushed a skid off, and a servant fell and was injured. The skids had been used for several years without accident, and that kind of skid was in general use. The skids were moved by the servants from car to car as the work progressed. Held, that the skids were not a "way" within the employer's liability act (Laws 1902, c. 600), but were appliances furnished for the performance of the work, so that, if the servant was injured by the negligence of fellow servants in the use of the skids, there was no liability.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 179.*

For other definitions, see Words and Phrases, vol. 8, pp. 7417–7418; vol. 8, p. 7834.]

5. MASTER AND SERVANT (§ 103*)—INJURY TO SERVANT—NEGLIGENCE—EVIDENCE.

A servant was injured while unloading a beef car, caused by a truck pushing a skid off the car. The appliances furnished for the work were free from hidden defects, and had been used for many years without accident. The servants moved the appliances from place to place as the work progressed. The servant injured was one in authority and the highest employé present, and he had inspected the appliances, and was satisfied that they were safe. The accident happened solely from the manner of the adjustment of the skids and the way in which the work was done. Held, as a matter of law, that the master was not liable.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 175; Dec. Dig. § 103.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from Trial Term, New York County.

Action by Rudolph Heiser against the Cincinnati Abattoir Company. From a judgment for plaintiff and from an order denying a new trial, defendant appeals. Reversed, and new trial ordered.

Argued before INGRAHAM, P. J., and McLAUGHLIN, SCOTT, LAUGHLIN, and CLARKE, JJ.

Frank V. Johnson (E. Clyde Sherwood, on the brief), for appellant. Henry G. K. Heath, for respondent.

CLARKE, J. The plaintiff had been for three years in the employ of the defendant as a "beef lugger." Defendant's place of business was at 531 West street. A row of warehouses extends along the street. In front is a platform about three feet high and five feet deep. Upon railroad tracks laid in the streets freight cars are delivered to the warehouses from time to time. Between the edge of the platform and the side of the car the space was 10 or 12 feet. There was an overhead rail on which a pulley with a hook attachment ran. When a beef car came in, a skid was extended from the car to a horse placed in the street. Then the quarters were attached to the hook on the overhead trolley, and, so hung, were shoved across the street and along the platform to the appropriate entrance into the warehouse. At certain times the cars contained other kinds of provisions, hams, etc. When this was the case, two skids were used. Each skid consisted of four 1½ inch planks each a foot wide, fastened under each end by cross-pieces, making a total width of 4 feet, and 6½ feet in length. The end of one of these skids rested on the top of the horse which was four inches wide, giving it two inches of support, the other on the platform in front of the warehouse where a cleat was nailed to keep it from slipping. The other skid resting with one end on the horse projected into the car. At this end in the car was placed a loose piece of plank so that the wheels of the truck could the more easily run up on the gangplank or skid. This truck was oblong, with open planked sides, running on two side wheels with a movable wheel at each end. Into it were put the hams and other provisions. It would then be shoved and pulled across this gangway to the platform, and thence to the proper opening in the warehouse.

On the morning in question the gangplank had been laid as indicated by the members of plaintiff's gang, of which he was in charge, and the plaintiff and two other men were engaged in unloading the car. They had been at work unloading from 5 to 7 o'clock in the morning. The plaintiff testified:

"I was in front on the platform of the car when the accident happened. I was wheeling the truck, and two men, Mr. Foote and Mr. Whitty, were behind pushing. When we started pushing the car out on the platform, the right-hand wheel of the truck struck the corner of the plank and pushed them a little bit sideways, about an inch, and then stopped, and the two men then pushed the truck back, and gave it a push, and struck the plank in front, and pushed it off; and the plank and I went down and the truck after. * * * At that time I was only steering the car. Before I had gone upon this platform to do work, I had made an inspection of it. I saw that it was put up like always. I saw that the nails and cleat were put in."

This loaded truck, weighing from 1,200 to 1,400 pounds, fell on him, and he received the injuries complained of.

It affirmatively appeared, without contradiction, that these skids which were being used at the time of the occurrence had been used for at least three or four years by the defendant's employés without accident, and that similar skids had been in use for similar purposes by other concerns in that locality engaged in similar lines of business. The court submitted to the jury the question whether the defendant furnished the plaintiff with a proper runway, whether he himself was guilty of negligence contributing to his injury, and whether he understood and assumed the risks incident to the use of these skids. Defendant contends that plaintiff failed to show that the accident was brought about by any negligence on the part of defendant, but that, on the other hand, the negligence, if any, which caused the plaintiff's injury, was that of himself and his fellow workmen, that the placing and fastening of the horse and planks, constituting the materials for this runway, were details of the work devolving upon the men themselves and not upon the master, that the case does not come within the provisions of the employer's liability act, and the question whether or not the plaintiff assumed the risk, which was perfectly open, obvious, and apparent to him, was one of law, and that for these reasons the complaint should have been dismissed, and, further, that the court erred in its rulings in the admission of evidence over the defendant's objection and exception and also in charging the jury, and that the damages awarded are excessive.

The defendant claims that the evidence of the plaintiff and his witnesses shows without dispute that his injury resulted, not from any negligent act of a superintendent, as no superintendent or other person higher in authority than the plaintiff himself was present on the morning of his injury, but the accident was caused by the slipping of the skid either because it was not originally set properly and securely fastened in place, or because of the negligent manner in which it was afterwards used by the men themselves; and reliance is placed upon Nappa v. Erie R. R., 195 N. Y. 176, 88 N. E. 30, 21 L. R. A. (N. S.) 96, for the proposition that these skids so placed from time to time as they were needed by the employés themselves did not constitute a way under the provisions of the employer's liability act. The plaintiff cites Trentacoste v. Cronin, 132 App. Div. 907, 116 N. Y. Supp. 755, and Knezevich v. Bush Terminal Co., 127 App. Div. 54, 111 N. Y. Supp. 255. In neither of those cases did it appear that the men themselves had erected the runways as temporary and movable aids in the performance of their work, but in each case the runways were erected without their participation, had an element of permanency, and were erected by the master and furnished in place for the work in hand.

In Nappa v. Erie R. R., 195 N. Y. 176, 88 N. E. 30, 21 L. R. A. (N. S.) 96, the action was brought under the employer's liability act. Plaintiff was a freight handler, and had been engaged in that occupation at the place where he was injured for five years or more. The

freight cars varied in width, the widest leaving a space of 10 inches between the outer edge of the platform and the floor of the car, the narrowest 16 inches. The car floor was four inches higher than the platform. In the conduct of this work there was employed a skid or running board, about three feet square, made of iron. One end thereof was placed on the floor of the freight car, and the other on the platform. It was customary at the end of the skid resting on the platform to nail a piece of wood or board, about five inches long and two inches thick, called a cleat, to hold it in place. There were several men in and about the freighthouse, called "coopers," whose duty it was, when called upon, to place the cleats in position. These coopers were ordinary workmen, holding no other position. They were supplied with hammer, nails, and cleats and subject to call when needed. In the event of the cooper not responding to the call, cleats were kept along the floor of the freighthouse within easy access, so that any workman could place them in position. The skid was moved by the workman from one car to another throughout the day, and was, with the trucks and other necessary implements, one of the regular tools employed to unload the cars. About the time of the accident the plaintiff and his fellow workmen were engaged in removing barrels of sugar from the car to the freighthouse.

"The plaintiff just prior to the accident had absented himself to get a drink of water. On returning he found the skid in position, and went to work immediately, with one foot on the platform and the other on the skid. Very soon thereafter, while handling a barrel of sugar, the skid slipped, and plaintiff's leg was caught between the barrel and the platform, inflicting the injury of which complaint is made. The plaintiff testified that he did not observe, what was the fact, that the cleat was not in position when the accident happened. Considerable evidence was introduced as to who was responsible for the failure to place the cleat in position during the brief absence of the plaintiff. In the view we take of the legal situation, this question is immaterial. * * * Subdivision 1, § 1, c. 600, Laws 1902. 'By reason of any defect in the condition of the ways, works or machinery connected with or used in the business of the employer which arose from or had not been discovered or remedied owing to the negligence of the employer or of any person in the service of the employer and intrusted by him with the duty of seeing that the ways, works or machinery were in proper condition.' It is argued by the counsel for defendant that section 1, subd. 1, Employer's Liability Act, under which this action is brought, is merely declaratory of the common law in this state. The counsel for plaintiff states in his brief that it may be conceded that the employer's liability act of this state makes no change in the common law with respect to the physical conditions or acts which create a liability or out of which a liability may arise. It follows that the cases in this and other jurisdictions prior to the enactment of the employer's liability act are applicable as to the liability of the defendant. The question of law presented upon the undisputed facts is as to whether the moving of the skid from car to car and securing it with the cleat was a detail of the work or a part of the ways, works, or machinery under the employer's liability act. * * . * We are of opinion that the skid and cleat, moved by the workmen from car to car, were no part of the ways, works, or machinery under the employer's liability act, nor of the safe place to work at common law. They were a part of the regular tools and appliances furnished to the freight handlers, and, if one of them was injured by the negligent act of another in using the same, it would be one of the risks of the employment, imposing no liability upon the master. Lord Esher, Master of the Rolls, in Willots v. Watt & Co. [1892] L. R. 2 Q. B. 92, 98, thus defines the word 'way' as used in the English employer's liability act: 'The course which a work-

man would in ordinary circumstances take in order to go from one part of a shop, where a part of the business is done, to another part where business is done, when the business of the employer requires him to do so, must be regarded as a way within the meaning of the statute.' The skid in the case at bar is not placed in position for workmen to walk over from the floor of the car to the floor of the freighthouse. It is an incline over which to allow articles of freight to slide or roll, guided, indeed, by the freight handler, who stands with one foot on the platform and the other on the side of the skid. The definition of Lord Esher above quoted renders the meaning of the word 'way' clear and satisfactory. A workman in a large manufacturing establishment being called upon, in the discharge of his duties, to pass from one portion of the building to another, possibly through places that are ill lighted, is entitled to have the place or way over which he is bound to pass safe. It seems an unreasonable and unnatural construction to hold that an ordinary skid, used in unloading freight cars, a mere tool or implement, can be regarded under the statute as a way."

The court then goes on to cite Hudson v. Ocean Steam-Ship Co. of Savannah, 110 N. Y. 625, 17 N. E. 342, and McCampbell v. Cunard Steam Ship Co., 144 N. Y. 552, 39 N. E. 637, both skid cases, and proceeded:

"The principle established by these authorities and others that might be cited is not embraced within or affected by the employer's liability act. The defendant was entitled to have the court charge, as his counsel in substance requested, that the use of the skid and cleat was a detail of the work and not covered by the employer's liability act."

If this definition of the word "way" is settled, then the skids here used were not a way but an appliance, and come within that class of simple and ordinary appliances illustrated by Marsh v. Chickering, 101 N. Y. 396, 5 N. E. 56, where a ladder was in question. "The rule is that the master does not owe to his servants the duty to furnish the best known or conceivable appliances. He is simply required to furnish such as are reasonably safe and suitable, such as a prudent man would furnish if his own life were exposed to the danger that would result from unsuitable or unsafe appliances. Burke v. Witherbee, 98 N. Y. 562; Shearm. & Redf. on Neg. § 92. The defendants had procured a ladder which ordinarily would be regarded as safe for the purpose for which it was used. The plaintiff had used it for a long time without any accident or danger, and on the very night of the accident it had been placed in position and used several times successfully. That it failed at last for any reason does not establish that it was unfit for use. It might perhaps have been more perfect if it had had hooks and spikes, but this improvement was not absolutely essential to relieve the defendants from liability. It was enough that it was reasonably safe and suitable within the rule cited, and under such circumstances an action will not lie."

I think it was error to admit the proof in reference to the Manhattan Company's skids. Plaintiff was permitted to prove that the Manhattan Campany used a different kind of skid, fastened by hooks, and claimed to be safe; that for a time that company had allowed the employés of the defendant the use of these skids, but had withdrawn that permission. The purpose was to show that the defendant could and should have procured a safer appliance than

that used and furnished by it. It was not proved that the kind used by the Manhattan Company was in general use, but it was proved, on the contrary, that the kind used by the defendant was in general use, and had been used for many years without an accident. While it would have been competent to have shown that these skids were unsafe, and in what respect, and also competent to show the kind of skids in general use by like concerns for similar purposes, I do not think it was competent to show a particular kind used by one house. That must follow from the general rule cited in the Marsh Case, supra, that the master does not owe to his servants the duty to furnish the best known or conceivable apparatus. If he is not so required, it is immaterial that some person somewhere has devised or used a later and better appliance.

The learned court refused to charge:

"That skids or planking composing the runway which is constructed and moved by the workmen from one car to another as the work of unloading such cars proceeds did not constitute a way within the meaning of the employer's liability act, but are appliances, implements, or tools furnished for the performance of the work, and, if one of the employés is injured by the negligence of another in the using of such appliance or implement, it is one of the risks of employment, and imposes no liability on the employer."

Then the plaintiff requested:

"I ask your honor to charge that, if the defendant had failed to provide a safe runway for the transportation of provisions from the car platform, the mere fact that the negligence of the plaintiff's fellow servants contributed towards the accident is no defense to the defendant."

The court so charged and defendant excepted. I think the refusal to grant the defendant's request and charging the plaintiff's was error.

The appliances furnished were simple in construction, with no hidden defects, had been used for many years without accident, were similar to those used by others engaged in the same business, and were reasonably safe and proper. There was no obligation to use the best, the safest, or the most recent device for doing the same work. These appliances were temporary in their nature, and put up in each instance by the gang which thoroughly knew its own work; according to the testimony of the members of it, no directions were given by anybody, except to point out the car to be unloaded, and they then would adjust the horse, the skids, etc. Plaintiff himself was the one in authority and the highest employé present, and himself inspected the erection, was satisfied that it was as it always had been, and after such inspection went to work thereon. The evidence shows the accident did not occur through any weakness or defect of material, but solely from the manner of adjustment, and the way in which the employés, including plaintiff, handled the truck.

It follows, therefore, that the judgment and order should be reversed and a new trial ordered, with costs to the appellant to abide the event. All concur.